# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 30, 2010

No. 09-41039

Lyle W. Cayce
Clerk

KELVIN ANDRE SPOTTS; BILLY AGUERO; MARCUS T. ARNOLD; BAENA JOSE MENDOZA; LLOYD BATTLES; ET AL

Plaintiffs - Appellants

v.

UNITED STATES OF AMERICA

Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, Chief Judge, and KING and HAYNES, Circuit Judges.

KING, Circuit Judge:

The plaintiffs–appellants, 453 present and former inmates of the Federal Correctional Complex, United States Penitentiary, in Beaumont, Texas, appeal the district court's dismissal of their claims under the Federal Tort Claims Act (FTCA) against the United States in connection with the decision made by Gerardo Maldonado, the Regional Director of the South Central Region of the Federal Bureau of Prisons, not to evacuate the Penitentiary in the aftermath of Hurricane Rita.[1]  The plaintiffs also challenge the district court's denial of leave

---

[1] The plaintiffs also initially challenged Maldonado's decision not to evacuate before the arrival of Hurricane Rita, but stated at oral argument that they are no longer pursuing this claim.

No. 09-41039

to amend their complaint to add *Bivens* claims against individual Penitentiary officials.  For the reasons discussed below, we affirm.

## I.    BACKGROUND

Hurricane Rita, a Category 3 storm, came ashore on September 24, 2005, shifting eastward in the final hours before landfall away from Houston, Texas, and toward Beaumont, Texas, which sustained a direct hit.  The Federal Correctional Complex in Beaumont, Texas, has three units:  a low-security Federal Correctional Institution; a medium-security Federal Correctional Institution; and a high-security United States Penitentiary.  Inmates from the low- and medium-security facilities were evacuated before or shortly after the hurricane's arrival.  The plaintiffs in this suit, inmates from the high-security Penitentiary, were not evacuated—a decision that Maldonado made the day after the storm.

Hurricane Rita left Beaumont without electricity, water, or gasoline, and the city was declared to be part of a nine-county disaster area.  The storm left the Federal Correction Complex with significant damage, rendering its emergency generator inoperable, sweeping away large portions of its roof, and leaving it without a supply of potable water.  The plaintiffs' evidence shows that Penitentiary officials attempted early on to establish a temporary power grid but that their efforts were frustrated by unexpected setbacks.  Emergency generators were delivered to the Penitentiary shortly after the storm, but without sufficient heavy wire to establish a grid.  This wire was not readily available, requiring Penitentiary officials to place a special order that took additional time to fill.  According to the plaintiffs' allegations, the Penitentiary was without electrical power for 36 days.

2

No. 09-41039

The significant discomfort caused by the lack of electricity was aggravated by a heat wave that swept the region in the days after the storm. The temperature exceeded 100 degrees Fahrenheit on sixteen of the days that the facility was without electricity and exceeded 90 degrees Fahrenheit on an additional seven. Inside the Penitentiary, the temperature was sometimes much higher. Floor wax melted; the cement and brick walls sweated; within a few days after the storm, the moisture developed into a slimy black mold. Without a working air conditioner, the air inside the prisoners' cells was stagnant. The inmates spent their nights in pitch black darkness, without the ability to access electric emergency alarms.

The inmates allege that during the first three days after the storm, they remained locked in their cells. Inmates with chronic ailments did not have access to medical care—asthmatics could not access inhaler refills, diabetics could not get their insulin. During these first days, the inmates allege that they "received no food at all from the guards." The guards did distribute water, but it was "colored brown with some type of matter flowing in it," and smelled foul. The plaintiffs contend that they drank this water in any case because they were so dehydrated from the heat. On September 26, 2005, the prisoners received written confirmation in a memorandum from Timothy Outlaw, the Warden of the Beaumont complex, that the Penitentiary's water source had been declared non-potable and "should not be ingested under any circumstance."

The plaintiffs allege that when they first received a meal, four days after the storm, the food provided was sandwiches made with moldy bread and spoiled meat and cheese or peanut butter, and that from that point they received no more than two sandwiches daily until power was restored. Around the same

3

time that the plaintiffs first received food, they began receiving one liter of sanitary water per day, though they contend that this was not sufficient to replenish fluids lost from the heat.

The inmates allege that they were not given the opportunity to shower until October 8, 2005, fourteen days after the storm. They allege that the shower water had a brownish color and offensive smell, and that the water immediately caused skin problems, such as open wound sores; peeling skin with pus; itching, burning rashes; and boils. The inmates did not receive medicine for these issues. No clean clothes were available, so the inmates were required to put their dirty clothes back on after showering.

The plaintiffs allege that they could not flush their toilets during the entire 36-day period, and that the odor of urine and feces in their cells was overpowering. There was little toilet paper and no way to wash their hands. When the toilets became too full, the guards passed out plastic bags in which the prisoners could relieve themselves. Filled bags were collected only at irregular intervals.[2]

---

[2] Although in this procedural posture we do not make any findings as to the credibility of the plaintiffs' allegations, we note that certain exhibits attached to the plaintiffs' own filings in the district court contradict some of the allegations raised in this case. For example, Outlaw's September 26, 2005, memorandum to prisoners regarding non-potable water added that although the water should not be ingested, it could otherwise "be utilized for routine daily usage," including bathing, washing clothing, and "drain[ing] washbasins of bodily waste." The implication of this memorandum is that the prisoners in fact had access to water in their cells for at least the limited purposes of flushing toilets. The plaintiffs have not attempted to explain why this memorandum, to which they have cited heavily for other purposes, does not controvert certain of their allegations. The plaintiffs also attached Penitentiary logs indicating that by September 27, 2005, three days after the storm, inmates "were given one floor fan and one disinfectant per cell"; inmates were released "out into the pod for 1 1/2 hours"; a Mrs. Baird's bread truck had arrived at the facility; the Penitentiary anticipated delivery of 93,000 half-pint bottles of water every four days starting on September 30, 2005 and every three days after October 7, 2005; and 11 medical relief staff had arrived with nurses and mid-level

No. 09-41039

The plaintiffs allege that they suffered physical injuries as the result of these events, including episodes of high stress; high blood pressure and heart disease; respiratory and lung disorders (from alleged exposure to ammonia from urine and feces and to mold); heat exhaustion and heat stroke; dehydration and malnutrition; Heliobactor Pylori (H. Pylori) infection (due to alleged exposure to human waste); diarrhea (due to alleged e-coli and salmonella exposure); blood stream infections; sleep deprivation; muscle atrophy (due to inactivity during lockdown); worsening of existing medical conditions; constipation; and pain from hunger.   They also allege mental injuries, including post-traumatic stress disorder; suicidal tendencies; depression; insomnia; and delusions. The plaintiffs also allege, without elaboration, that two inmates died as a result of these conditions.

The plaintiffs sued under the FTCA alleging that the decision not to evacuate the inmates after the storm gave rise to the state-law torts of negligence, recklessness, deliberate indifference, intentional infliction of emotional distress, malice, and wrongful death.[3]   When the district court dismissed those claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, the plaintiffs sought leave to file a Fourth Amended Complaint that raised substantially the same claims in an action

---

providers.  The plaintiffs have not addressed the apparent inconsistencies between their allegations and the actions documented in the logs they attach.

[3] The plaintiffs also brought a claim under the FTCA for an Eighth Amendment violation as a "constitutional tort."  Constitutional torts, of course, do not provide a proper predicate for an FTCA claim. *See FDIC v. Meyer*, 510 U.S. 471, 478 (1994) (holding that a plaintiff's FTCA claim must be based on a state-law tort claim and cannot be based on a federal constitutional or statutory claim against the Government).  They do not reurge the Eighth Amendment as an FTCA predicate on appeal.

No. 09-41039

against individual Penitentiary officers under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The district court adopted the magistrate judge's recommendation that leave to file the amended complaint under Federal Rule of Civil Procedure 15 be denied. The magistrate judge reasoned that leave would be futile because the *Bivens* claims were time-barred. The plaintiffs appeal both the dismissal of their FTCA claims and the denial of leave to amend.

## II.    STANDARD OF REVIEW

We review de novo the district court's order granting the Government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. *St. Tammany Parish, ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009). "In our de novo review . . . , we apply the same standard as does the district court." *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007) (internal quotation marks omitted). In applying Rule 12(b)(1), the district court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *St. Tammany Parish*, 556 F.3d at 315 (internal quotation marks omitted). "Here, the district court did not resolve any disputed facts,[4] so we, as did the district court, consider the allegations in the

---

[4] The plaintiffs contend that the district court and magistrate judge *did* resolve disputed facts by citing certain disputed statements from a declaration by Maldonado that the Government submitted as an exhibit to its motion to dismiss. But there is no evidence that the district court or magistrate judge relied upon Maldonado's declaration in reaching their determinations, or that the declaration was relevant or necessary to their determinations. *See Spotts v. United States*, 1:08-cv-376, 2009 WL 3150872, at *3 (E.D. Tex. Sept. 26, 2009). In any

plaintiff's complaint as true." *Id.* (internal quotation marks omitted). "[O]ur review is limited to determining whether the district court's application of the law is correct and, to the extent its decision [was] based on undisputed facts, whether those facts are indeed undisputed." *Id.* (internal quotation marks omitted). We then ask if dismissal was appropriate. *Id.*

Although we generally review a district court's denial of leave to amend for abuse of discretion, where, as here, the district court's sole reason for denying such an amendment is futility, "we must scrutinize that decision somewhat more closely, applying a de novo standard of review similar to that under which we review a dismissal under Rule 12(b)(6)." *Wilson v. Bruks–Klockner, Inc.*, 602 F.3d 363, 368 (5th Cir. 2010); *see also Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872–73 (5th Cir. 2000).

## III.    THE FTCA CLAIMS

The FTCA waives sovereign immunity and permits suit against the United States for claims sounding in state tort law for money damages. 28 U.S.C. § 2674 (waiving sovereign immunity to make the Government liable "in the same manner and to the same extent as a private individual under like circumstances"). It provides district courts with jurisdiction over monetary claims against the Government for the negligent or wrongful acts of its employees "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

---

event, we do not rely upon Maldonado's declaration in our de novo review, instead taking the plaintiffs' allegations as true.

No. 09-41039

The liability of the United States under the FTCA, however, is subject to various exceptions contained in 28 U.S.C. § 2680, including the "discretionary function" exception. *See United States v. Gaubert*, 499 U.S. 315, 322 (1991). The discretionary function exception withdraws the FTCA's waiver of sovereign immunity in situations in which, although a government employee's actions may have been actionable under state tort law, those actions were required by, or were within the discretion committed to, that employee under federal statute, regulation, or policy:

> The provisions of this chapter and section 1346(b) of this title shall not apply to[ a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The Government contends that the discretionary function exception applies to the challenged decision in this case because in deciding not to evacuate after the storm, Maldonado was operating within the bounds of the discretion committed to him under 18 U.S.C. § 4042(a), which requires the Federal Bureau of Prisons to provide for the safekeeping, care, and subsistence of all federal prisoners, but does not indicate the manner in which the duty must be fulfilled.[5]    The district court concluded that the discretionary function

---

[5] Section 4042(a) provides:

(a)  In general.—The Bureau of Prisons, under the direction of the Attorney General, shall—
> (1)  have charge of the management and regulation of all Federal penal and correctional institutions;
> (2)  provide suitable quarters and provide for the safekeeping, care, and

exception deprived it of subject matter jurisdiction and granted the Government's motion to dismiss under Rule 12(b)(1) on that basis. The plaintiffs appealed, arguing that the discretionary function exception should not apply because Maldonado violated nondiscretionary duties imposed by other statutes, regulations, and policies in deciding not to evacuate after the storm.

To properly evaluate the plaintiffs' contentions, some exegesis of the operation of the discretionary function exception is necessary. The Supreme Court has developed a two-part test for determining whether agency conduct qualifies as a discretionary function or duty. *See Gaubert*, 499 U.S. at 322–23. Under the first prong, the conduct must be a "matter of choice for the acting employee." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "The exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). Thus, "'it is the nature of the conduct, rather than the status of the actor' that governs whether the exception applies." *Id.* (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines)*, 467 U.S. 797, 813 (1984)). If a statute, regulation, or policy leaves it to a federal agency to determine when and how to take action, the agency is not bound to act

---

subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

(3)  provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;

(4)  provide technical assistance to State and local government in the improvement of their correctional systems; and

(5)  provide notice of release of prisoners in accordance with subsections (b) and (c).

18 U.S.C. § 4042(a).

in a particular manner and the exercise of its authority is discretionary. *See id.* at 329.

"The requirement of judgment or choice is not satisfied" and the discretionary function exception does not apply, however, "if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Id.* at 322 (quoting *Berkovitz*, 486 U.S. at 536). In other words, the discretionary function exception does not apply if the challenged actions in fact violated a federal statute, regulation, or policy. *See id.* at 324 ("If the employee violates [a] mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."); *Berkovitz*, 486 U.S. at 547 ("[I]f the [agency]'s policy did not allow the official who took the challenged action to [act] on the basis of policy considerations[,] the discretionary function exception does not bar the claim."). As the circuits have concluded, the reason for this rule is obvious—a federal employee cannot be operating within his discretion if he is in fact violating a nondiscretionary policy. Our court has explained:

> Just because the discretionary function exception would generally shield the government from FTCA liability otherwise arising from [a] policy decision, it does not follow that the government is automatically shielded from such liability when the acts of the particular agents seeking to implement that policy violate another federal law, regulation, or express policy. Actions taken to carry out a discretionary policy must be taken with sufficient caution to ensure that, at a minimum, some other federal law is not violated in the process.

*Johnson v. Sawyer*, 980 F.2d 1490, 1503 (5th Cir. 1992), *vacated on other grounds*, 47 F.3d 716 (5th Cir. 1995).

No. 09-41039

Under the second prong of the test, "even 'assuming the challenged conduct involves an element of judgment,'" and does not violate a nondiscretionary duty, we must still decide whether the "'judgment is of the kind that the discretionary function exception was designed to shield.'" *Gaubert*, 499 U.S. at 322–23 (quoting *Berkovitz*, 486 U.S. at 536); *see also Varig Airlines*, 467 U.S. at 813. "Because the purpose of the exception is to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Gaubert*, 499 U.S. at 323 (quoting *Berkovitz*, 486 U.S. at 537; *Varig Airlines*, 467 U.S. at 814 (internal citation omitted)). In this regard, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id.* at 324.

The plaintiffs contend that neither prong of the *Berkovitz* test is satisfied in this case. They contend that prong one is not satisfied because Maldonado's decision not to evacuate violated certain nondiscretionary statutory and policy duties. They contend that prong two is not satisfied because the decision not to evacuate was not a policy judgment or susceptible to policy analysis. Each of these contentions is discussed in turn. We note that the plaintiffs bear the burden of showing Congress's unequivocal waiver of sovereign immunity. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). At the motion to dismiss stage, this includes pleading facts that facially allege matters

11

No. 09-41039

outside of the discretionary function exception. *St. Tammany Parish*, 556 F.3d at 315 n.3.

## A.     Prong One:     Whether the Decision Not to Evacuate Violated Nondiscretionary Duties

The plaintiffs do not dispute that Maldonado's decision not to evacuate fell within the bounds of discretion committed to him for the administration of prisons under 18 U.S.C. § 4042(a).  They contend, however, that the Eighth Amendment, the Safe Drinking Water Act, and various policies of the Federal Bureau of Prisons imposed nondiscretionary duties that were violated by the decision not to evacuate.[6]  In evaluating these arguments, we accept arguendo the plaintiffs' contention that to constrain Maldonado's discretion in this case, the statute, regulation, or policy at issue need not specifically require evacuation, but instead might simply impose other nondiscretionary duties—such as duties to provide certain living standards to inmates—that Maldonado would have violated in deciding not to evacuate.

### 1.     The Eighth Amendment

The plaintiffs argue on appeal that Maldonado's decision not to evacuate violated the Eighth Amendment's ban on cruel and unusual punishment, and that this constitutional violation precludes the application of the discretionary function exception.  This court has not yet determined whether a constitutional violation, as opposed to a statutory, regulatory, or policy violation, precludes the application of the discretionary function exception. *See Castro v. United States*, --- F.3d ---, 2010 WL 2183616 (5th Cir. June 2, 2010).  We need not decide the

---

[6] An "Adverse Weather Contingency Plan" for the Beaumont facility imposed certain nonmandatory duties on the Penitentiary officials, but the plaintiffs do not allege on appeal that the officials' decision not to evacuate violated any of these duties.

No. 09-41039

issue here, however, because we conclude that the plaintiffs waived this argument by failing to raise it in the district court.

We observe, as the Government emphasized at oral argument, that although the plaintiffs' pleadings asserted that the officials' conduct of the Penitentiary in the aftermath of the storm was "cruel and unusual" and therefore a "constitutional tort" actionable under the FTCA,[7] the plaintiffs did *not* plead, and never argued to the district court, that the Eighth Amendment precluded the application of the discretionary function exception. Even in their objections to the magistrate judge's report and recommendations, in which the plaintiffs cited numerous federal statutory and regulatory requirements that they contended precluded the application of the discretionary function exception, they nowhere cited the Eighth Amendment for the same. The plaintiffs' argument that the Eighth Amendment precluded the operation of the discretionary function exception appeared for the first time in their appellate briefing, where it became virtually the centerpiece of the appeal. The plaintiffs have not explained why they did not raise this argument earlier.

To state a claim under the FTCA, a plaintiff has the burden of stating a claim for a state-law tort and establishing that the discretionary function exception does not apply. *St. Tammany Parish*, 556 F.3d at 315 n.3. The plaintiffs never raised their present Eighth Amendment argument when the district court was evaluating the merits of their FTCA claim. By failing to plead or otherwise argue to the district court that the alleged Eighth Amendment

---

[7] Such claims are not actionable under the FTCA. As noted above, a constitutional violation does not provide a proper predicate for an FTCA claim. *See FDIC v. Meyer*, 510 U.S. at 478 (holding that a plaintiff's FTCA claim must be based on a state-law tort claim and cannot be based on a federal constitutional or statutory claim against the Government).

No. 09-41039

violation precluded the application of the discretionary function exception, the plaintiffs have waived this contention on appeal. *See, e.g.*, *Lemaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007) ("[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal."); *Tex. Comm. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 510 (5th Cir. 2005).

### 2.    The Safe Drinking Water Act

The plaintiffs also contend that the decision not to evacuate after the storm violated nondiscretionary duties imposed by the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.*, which sets out national drinking water regulations for public water systems in each state. Among other requirements, the Act imposes maximum permissible levels for certain drinking water contaminants. As a matter of Bureau of Prisons policy, under Program Statement 1600.08, federal prison officials are required to follow the provisions of the Safe Drinking Water Act.

We first note that the plaintiffs have not, in the district court or in this court, specified which requirements of the Safe Drinking Water Act the conditions at the Penitentiary failed to meet. The plaintiffs' pleadings and briefing only allege, conclusorily, that Maldonado's decision as to whether or not to evacuate was constrained by nondiscretionary duties imposed by the Safe Drinking Water Act. They do not state which provisions of the Act, or regulations promulgated under the Act, were violated by that decision. These vague allegations, without more, arguably do not satisfy the plaintiffs' burden

of pleading facts that allege conduct outside the discretionary function exception. *See St. Tammany Parish*, 556 F.3d at 315 n.3.[8]

In any event, the plaintiffs' contention that the Safe Drinking Water Act imposed nondiscretionary duties that were contravened by the decision not to evacuate lacks merit. The Safe Drinking Water Act delegates primary enforcement responsibility to the individual states, provided that the Environmental Protection Agency's Administrator has certified the state as meeting the conditions prescribed by 42 U.S.C. § 300g–2 and the regulations promulgated under that statute. Texas has obtained such certification.[9] Texas law provides a defense against water quality enforcement actions in circumstances of natural disasters. TEX. WATER CODE ANN. § 7.251 (West 2008) ("If a person can establish that an event that would otherwise be a violation of a statute within the commission's jurisdiction . . . was caused solely by an act of God, war, strike, riot, or other catastrophe, the event is not a violation of that statute, rule, order, or permit."). In the aftermath of Hurricane Rita, on September 27, 2005, the Texas Commission on Environmental Quality invoked § 7.251 and issued a Regulatory Guidance document, which provided that "all rules and regulations that may inhibit or prevent prompt response to this threat

---

[8] The plaintiffs contend that they filed evidence supporting a finding that the Safe Drinking Water Act was violated as exhibits to a motion for summary judgment filed in the district court. But that motion was never resolved, resolution having been stayed pending the district court's decision on the motion to dismiss. Furthermore, although some of these exhibits describe problems with water quality at the Penitentiary in the immediate aftermath of the storm, the plaintiffs again do not explain which provisions of the Safe Drinking Water Act are implicated by these problems.

[9] *See* Tex. Comm'n on Envt'l Quality, Public Water Supply Supervision Program, at http://www.tceq.state.tx.us/permitting/water_supply/pdw/pwss.html (last visited June 22, 2010).

No. 09-41039

are suspended for the duration of the incident." Because the nondiscretionary duties otherwise imposed by the Safe Water Drinking Act were suspended in the aftermath of the hurricane, the plaintiffs cannot rely on these duties as bases for constraining Maldonado's discretion.

### 3.    Program Statement 1290.04

Finally, the plaintiffs contend that the decision not to evacuate after Hurricane Rita violated nondiscretionary policy duties imposed by Bureau of Prisons Program Statement 1290.04, titled "Correctional Statements and Accreditation." Program Statement 1290.04 requires federal correctional institutions to obtain accreditation from the American Correctional Association (ACA), a private, nonprofit organization. The ACA will grant accreditation if the correctional institution meets a certain number of mandatory and nonmandatory standards promulgated by the ACA. Full compliance with nonmandatory standards is not necessary to obtaining accreditation. *See* AM. CORRECTIONAL ASS'N, STANDARDS FOR ADULT CORRECTIONAL INSTITUTIONS xviii (4th ed. 2003). Throughout their briefing, the plaintiffs cite to a superseded version of this publication. The current, 2003 version sets out the standards that were applicable when Hurricane Rita made landfall in September 2005. In the current edition, the standards have been renamed "Expected Practices" and have been renumbered. In discussing the standards the plaintiffs have cited, we refer to both the superseded and renumbered versions.

Program Statement 1290.04 sets out the requirement of ACA accreditation; the time frame for obtaining accreditation; the circumstances under which the time for accreditation may be extended or waived; procedures for annual recertification; and the methods through which compliance will be

16

monitored and audited.  It does not set out the particular mandatory and nonmandatory standards that the ACA considers in granting accreditation, nor does it incorporate them by reference.  The plaintiffs do not allege that Maldonado's decision not to evacuate after Hurricane Rita resulted in a failure to obtain accreditation or recertification for the Penitentiary.  They therefore have not alleged that Maldonado's decision violated nondiscretionary duties imposed by Program Statement 1290.04.

In any event, the majority of the ACA standards that the plaintiffs allege to have been violated are nonmandatory.[10]  And as to the mandatory statements that the plaintiffs allege were violated, none imposes duties that were violated by the decision not to evacuate.  The plaintiffs cite Expected Practice 4-4332 (formerly Standard 3-4313), which requires institutions to "provide[ ] for the control of vermin and pests," as evidence that the Penitentiary officials were required to remediate the mold that grew on the Penitentiary walls in the damp aftermath of the storm.  But the plaintiffs do not cite a dictionary definition or otherwise explain how mold qualifies as a "vermin" or "pest."  The plaintiffs next

---

[10] *See, e.g.*, Expected Practice 4-4216 (formerly Standard 3-4204) (prison should possess "equipment necessary to maintain essential lights, power, and communications in an emergency"); Expected Practice 4-4328 (formerly Standard 3-4309) (prison should serve at least three meals per day, two of them hot); Expected Practice 4-4340 (formerly Standard 3-4321) (prison should provide freshly-laundered sheets, pillows, pillowcases, and towels at least weekly); Expected Practice 4-4342 (formerly Standard 3-4324) (prison should provide personal hygiene items such as toilet paper); Expected Practice 4-4137 (formerly Standard 3-4132) (prison should provide 24-hour access to toilets and hand-washing); Expected Practice 4-4138 (formerly Standard 3-4133) (prison should provide operable wash basins with hot and cold running water); Expected Practice 4-4139 (formerly Standard 3-4134) (prison should provide operable showers with hot and cold running water); Expected Practice 4-4152 (formerly Standard 3-4145) (prison should maintain indoor air circulation of 10 cubic feet of fresh or recirculated filtered air per occupant); Expected Practice 4-4153 (formerly Standard 3-4146) (prison should maintain indoor living temperatures appropriate for the season).

cite Expected Practice 4-4330 (formerly Standard 3-4311), which requires an institution's potable water to be "in compliance with jurisdictional laws and regulations," and contend that under this Expected Practice, the Penitentiary officials were required to comply with the provisions of the Safe Drinking Water Act. But, as discussed above, the requirements of the Safe Drinking Water Act were suspended by law in the aftermath of the storm. Finally, the plaintiffs cite Expected Practice 4-4344 (formerly Standard 3-4331), which requires that "[u]pon arrival at the facility, all offenders [be] informed about how to access health services and the grievance system." There is no allegation that the Penitentiary officials failed to inform inmates about health system access. In sum, Maldonado's decision not to evacuate did not violate any nondiscretionary duties imposed by the standards that the plaintiffs cite.

The parties agree that in deciding not to evacuate after the storm, Maldonado was acting within the discretion accorded by 18 U.S.C. § 4042(a). The plaintiffs have not pointed to any nondiscretionary duties that were violated by the exercise of this discretion. Accordingly, the decision meets the first prong of the *Berkovitz* test.

**B.    Prong Two: Whether the Decision Not to Evacuate Was "Based on Considerations of Public Policy"**

Under the second prong of the *Berkovitz* test, we agree with the district court that Maldonado's decision not to evacuate the Penitentiary in the aftermath of Hurricane Rita was the type of public policy consideration that the discretionary function exception shields from judicial scrutiny. *See Freeman v. United States*, 556 F.3d 326, 340 (5th Cir. 2009). As we observed in *Freeman*, which involved a challenge to federal officials' management of relief operations and evacuation efforts in the aftermath of Hurricane Katrina, "the government's

18

No. 09-41039

decisions about when, where, and how to allocate limited resources within the exigencies of an emergency are the types of decisions that the discretionary function exception was designed to shelter from suit." *Id.* We noted in particular that "decisions regarding the feasibility, safety, and benefit of mobilizing federal resources in the aftermath of a national disaster are grounded in social, economic, and public policy." *Id.* at 341. All of these concerns were present here. Particularly in light of the "strong presumption" that, where permitted by the relevant statute or regulation, the exercise of choice or judgment implicates relevant policy, *see Gaubert*, 499 U.S. at 324, we conclude that the official's decision was the type of policy decision protected by the discretionary function exception and therefore meets the second prong of the *Berkovitz* test.

In reaching this conclusion, we observe, as we did in *Freeman*, 556 F.3d at 341, that the proper inquiry under prong two is not whether Maldonado *in fact* engaged in a policy analysis when reaching his decision but instead whether his decision was "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325 ("The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."); *see also Shansky v. United States*, 164 F.3d 688, 692 (1st Cir. 1999) ("The critical question is whether the acts or omissions that form the basis of the suit are susceptible to a policy-driven analysis, not whether they were the end product of a policy-driven analysis."). Whatever Maldonado's actual decisionmaking process, it is

19

No. 09-41039

clear that the health, safety, financial, and other feasibility concerns implicated by the evacuation decision render that decision susceptible to policy analysis.[11]

Because both prongs of the *Berkovitz* test are met, we conclude that the discretionary function exception precludes subject matter jurisdiction over the plaintiffs' FTCA claims. In reaching this conclusion, we do not minimize or discount the severe hardships that the plaintiffs endured in the aftermath of the storm. We simply lack jurisdiction to provide relief under the statute through which the plaintiffs have chosen to pursue their claims.

## IV.    THE *BIVENS* CLAIMS

The plaintiffs also appeal the district court's denial of leave to file a proposed Fourth Amended Complaint, which would have raised substantially the same claims against the individual Penitentiary officials as a *Bivens* action in the event that the district court accepted the magistrate judge's recommendation to dismiss the plaintiffs' FTCA claims. The magistrate judge recommended that leave to amend under Federal Rule of Civil Procedure 15 should be denied as futile because the plaintiffs' *Bivens* claims were time-barred. The district court entered final judgment dismissing the FTCA claims for lack of subject-matter jurisdiction and denied "[a]ll motions not previously ruled on," which included the motion to amend.

---

[11] The plaintiffs cite *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005), and *In re Katrina Canal Breaches Consolidated Litigation*, 471 F. Supp. 2d 684 (E.D. La. 2007), for the proposition that the decision not to evacuate is not susceptible to policy analysis, but, as the district court explained, these cases are not binding precedent and are readily distinguishable. *See Spotts v. United States*, No. 1:08-cv-376, 2009 WL 3150872, at *3 (E.D. Tex. Sept. 26, 2009). The plaintiffs also contend that prong two is not satisfied if the decision at issue violated nonmandatory duties. But this inquiry properly falls under prong one. Moreover, we have already addressed and rejected the plaintiffs' contention that the decision at issue violated the various nonmandatory duties that they cite.

No. 09-41039

The magistrate judge reasoned that the *Bivens* claims were time-barred because the applicable statute of limitations had run. As the magistrate judge correctly observed, a *Bivens* action is controlled by the applicable state statute of limitations. This circuit, applying Texas law, has held that the statute of limitations period on a *Bivens* claim is two years, the statute of limitations governing personal injuries in Texas. *See Brown v. Nationsbank Corp.*, 188 F.3d 579, 590 (5th Cir. 1999); *Pena v. United States*, 157 F.3d 984, 987 (5th Cir. 1998). The magistrate judge concluded that the *Bivens* claims were time-barred because they accrued on September 24, 2005, when Hurricane Rita made landfall, but the plaintiffs did not move for leave to file a Fourth Amended Complaint until September 2, 2009, almost four years later. The magistrate judge further concluded that the *Bivens* claims did not relate back to the original complaint and that even if they did, they would be time-barred because the original complaint was filed on January 9, 2008, more than two years after the *Bivens* claims would have accrued.

On appeal, the plaintiffs contend that the magistrate judge should have applied Texas's residual, four-year limitations period to the *Bivens* claim, arguing that this is not a "personal injury lawsuit," but a "civil rights complaint." This characterization of the claim does not help the plaintiffs because we have previously held that federal civil rights claims filed in Texas are subject to Texas's two-year statute of limitations for personal injury. *Jones v. Alcoa*, 339 F.3d 359, 364 (5th Cir. 2003) (addressing § 1981 claims and stating: "Federal civil rights actions . . . lack[ing] an express statute of limitations[ ] are governed by the most closely analogous limitations period provided under state law. . . .

21

[I]n Texas, the two-year statute of limitations for personal injury actions in Texas controls.").

The plaintiffs also challenge the magistrate judge's conclusion that all of their claims began to accrue on September 24, 2005, when the hurricane made landfall. The plaintiffs contend that some inmates were not diagnosed with H. Pylori infection until October 29, 2008, and argue that the statute of limitations did not begin to run until that point. But the time of the actual diagnosis is not dispositive. The plaintiffs contend that they began experiencing H. Pylori symptoms almost immediately after the storm, and the record shows that they began filing administrative claims regarding these symptoms as early as February 2006. Under federal law, a claim accrues and "the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001) (modifications and internal quotation marks omitted). The plaintiffs also complain that they continue to be sickened by unremediated toxic mold and algae resulting from the storm, and that the Penitentiary officials' decision not to take remedial steps constitutes a continuing tort. But, as the plaintiffs have conceded at numerous points in this litigation, their only challenge is to the decision not to evacuate after the storm. The plaintiffs do not attempt to draw any causal connection between this evacuation decision and the continuing presence of mold on the Penitentiary walls (which presumably would have grown whether or not the prisoners were evacuated in the immediate aftermath of the storm), and this court is aware of none. The amendment that the plaintiffs sought would have

No. 09-41039

been futile because the *Bivens* claims were time-barred. Accordingly, we affirm the district court's denial of leave to amend.

## V.    CONCLUSION

For the above reasons, we conclude that the United States has not waived sovereign immunity for the discretionary functions alleged in this case and therefore AFFIRM the district court's dismissal for lack of subject matter jurisdiction of the plaintiffs' FTCA claims. We also AFFIRM the district court's denial of plaintiffs' motion for leave to amend to add *Bivens* claims.